OPINION *Page 2 
{¶ 1} Appellant, Marsha Mills, appeals her convictions for murder, felonious assault and child endangering. Appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On October 6, 2006, appellant, Marsha Mills, was indicted by the Tuscarawas County Grand Jury on three counts of murder in violation of R.C. 2903.02(B), one count of felonious assault in violation of R.C. 2903.11(A)(1), and two counts of child endangering in violation of R.C. 2919.22(B)(1) and (3).
 {¶ 3} The charges stem from an incident that occurred on May 10, 2006, at appellant's home. Appellant was babysitting four children including the victim, Noah Shoup. While in appellant's care, Noah suffered head injuries that caused his death. Appellant claimed that Noah's injuries were caused by an accidental fall down some steps and the subsequent emergency medical treatment. The State argued the injuries were the result of physical abuse.
 {¶ 4} On May 30, 2007, the matter proceeded to jury trial. At trial, the evidence presented was as follows:
 {¶ 5} Douglas Shoup, the father of the deceased child, Noah Shoup, testified that he and his wife, Kristen Shoup, hired appellant to provide daycare for their two children, Evan and Noah. On May 10, 2006, at approximately 12:30 P.M., Doug took Evan to appellant's home. Noah had already been dropped off earlier in the morning by his mother, Kristen. At approximately 2:25 P.M., the appellant called Doug and told him Noah had fallen off the back porch and was unconscious. The appellant also told Doug she had not called 911. Doug called 911 for emergency assistance. *Page 3 
 {¶ 6} Douglas Shoup testified, that after speaking with appellant, he rushed to her home. When he arrived, he ran to the back porch but no one was there. He then ran into the front of the house and found paramedics working on Noah in the bedroom. He testified that appellant told him Noah fell off the bottom step of the back porch stairs.
 {¶ 7} Kristen Shoup, testified that on May 10, 2006, she got Noah dressed and took him to the appellant's home. She stated that Noah did not have any physical injuries in the morning. She stated that when she arrived at appellant's home, appellant's sister, Jerri, and the appellant's two granddaughters (an infant and a two year old) were present. She testified appellant appeared to have been crying but was fine when she left the house. Kristen also testified that Noah, who was approximately two years of age at the time of the incident, began to walk when he was eleven months old and now went down stairs either holding onto the railing or scooting down the steps on his bottom.
 {¶ 8} James Shultz from the New Philadelphia Fire Department testified that, at 2:31 P.M., on May 10, 2006, he responded to a 911 call at appellant's home. Upon arrival, he found Noah in the bedroom unconscious. He stated that appellant told him Noah had never returned to consciousness. The appellant also told him that Noah had fallen down three steps and hit his back on the concrete at the bottom of the steps.
 {¶ 9} James Shultz testified that, when he arrived, Noah appeared lifeless. He stated that the heart monitor indicated Noah was systolic, i.e., "flat line." He testified he administered emergency medical treatment including a jaw thrust maneuver to open Noah's airway, CPR (which involved one to one and a half compressions on Noah's chest at a rate of approximately one hundred times per minute) and the application of a *Page 4 
bag valve mask to provide ventilation. He stated that he immobilized Noah and applied a disposable pediatric c-collar to Noah's neck. He stated that he noticed immediately the c-collar was going to interfere with CPR, removed the c-collar and fashioned a cervical collar out of a towel. He testified Noah's respiration was maintained with the bag valve mask. He stated Noah was placed on a backboard for transport. He testified he established interosseous access by placing a needle below Noah's right knee into his bone, thereby, administering an IV which allowed fluids and drugs to quickly enter Noah's circulation. He stated they also gave Noah epinephrine to stimulate his heart.
 {¶ 10} James Shultz testified that, in the ambulance, they placed an endotracheal tube in Noah's trachea to provide oxygen directly to Noah's lungs. He stated that, upon arrival at the hospital, Noah's heart started to show signs of attempting to beat again. He also stated Noah's pupils remained fixed and dilated and Noah never regained consciousness. He testified that, in his experience, he has never known the back board, CPR procedures and/or cervical collars to bruise or injure patients.
 {¶ 11} Allen Dougherty, a firefighter/paramedic from the New Philadelphia Fire Department, testified that he responded to the appellant's home. He stated that appellant told him Noah fell down the steps. He observed the steps and relayed the information to the paramedics.
 {¶ 12} Charles Willet from the New Philadelphia Police Department testified that he arrived at appellant's home around 2:30 P.M. He stated that appellant told him she took the children out to play and Noah led the way. Appellant told him that Noah stepped off the back porch, missed a step, fell and hit the cement. Appellant told him she rushed over, picked up Noah, took him in the house and applied cold compresses *Page 5 
to his head. Appellant also told him Noah "came to", refused the compress and lost consciousness.
 {¶ 13} Detective Larry Hootman, a detective with the New Philadelphia Police Department testified that, on May 10, 2006, he was called to investigate. He stated that, upon arrival, he was told the child had fallen down the back steps. He stated that he got on his hands and knees and examined the cement at the bottom of the steps and did not see any signs of blood or other evidence of a fall. He testified that appellant told him she was taking the children out to play in the backyard. Appellant stated that as she exited the house, she was holding her granddaughter. She told him that she turned around to make sure the door was closed, turned back around and saw Noah at the bottom of the steps on the cement. She told him she picked Noah up, took him into the house and applied some cold compresses to his face. She told him Noah regained consciousness, opened his eyes and appeared to be trying to talk, but never said anything. She told him she contacted Noah's father who called 911. She told him she did not call 911 because she thought Noah was regaining consciousness. She also told Detective Hootman everything happened so fast, she couldn't actually tell him what happened to Noah.
 {¶ 14} Detective Hootman testified that he took measurements of the back steps and porch. He testified the porch measures three foot six and a quarter inches vertically from the top to the cement. He stated the riser between the bottom step and the concrete is nine and a half inches.
 {¶ 15} Dr. John Currant, an emergency room physician at Union Hospital, treated Noah. He testified that he continued to administer advanced life support and assessed *Page 6 
Noah. He stated Noah received eight rounds of drugs which caused his heart to start beating. He stated that he called for transport to Akron Children's Hospital. He stated that while they were waiting for the transport, they performed a CAT scan of Noah's brain, neck, chest and abdomen. He stated that the CAT scan showed Noah had a subarachnoid bleed around the brain and a small pinpoint hemorrhage on the left temporal lobe of his brain. He stated the CAT scan of the cervical spine did not show any fractures on the bone or spine, but did show fluid and bruising in Noah's left lung.
 {¶ 16} Dr. Current also testified an accidental fall would typically cause abrasions and/or a buckle fractures. He stated that when children fall either forward or backward, children tend to put their arms out to break their fall. He stated that in these circumstances you will also find head injuries because children's heads are heavier and they tend to lead with their heads as they fall. He stated head injuries include an abrasion or a cut, if the concrete is rough, or a large swelling (i.e. a goose egg") and a bruise where the impact occurred. He stated he did not observe these types of injuries in Noah's case. He further stated Noah's injuries were not consistent with a three and a half foot fall onto a concrete surface. He also testified he would not expect a child to die as the result of a three and a half foot fall.
 {¶ 17} Dr. Current also testified the bruising to the left side of Noah's face was not caused by a cervical collar. He stated a cervical collar that typically fits around a child's neck is flexible and is padded with soft foam. He stated a c-collar would not cause bruising to the entire side of a child's face. Dr. Current testified that a child could receive injuries from advanced life saving efforts, but that those injuries would typically *Page 7 
include lip injuries or chipped teeth from intubation, chest bruising or broken ribs from CPR.
 {¶ 18} Dr. Emily Scott, a pediatric emergency medicine physician in the emergency room of Akron Children's Hospital, testified that she received a phone call from Dr. Current requesting that Noah be transferred to Akron Children's Hospital. She testified that, when Noah arrived at the hospital, he was given a blood transfusion. She testified the typical injuries sustained by a child from a fall onto concrete include abrasions, a big goose egg and lacerations. She stated that she did not observe any of these types of injuries on Noah and that Noah's injuries were not consistent with a three and a half foot fall onto concrete.
 {¶ 19} Dr. Richard Daryl Steiner, a pediatrician at Akron Children's Hospital, testified that, in his opinion, Noah's injuries were caused by rapid rotational acceleration and deceleration. He stated these types of injuries cause a thin film of subdural hemorrhage over the surface of the brain, bleeding within the brain and bleeding between the two hemispheres in the interhemispheric fissure. He stated that blood collects in these areas because blood vessels are torn when the child goes through the rotational acceleration deceleration force. He stated that other injuries from these forces include retinal hemorrhages, i.e., bleeding inside the eye on the surface and within the layer of the retina. He stated that when a child experiences a rapid acceleration and deceleration force, the symptoms of the injury are immediate and may cause a profound alteration in consciousness and, as in Noah's case, cardiopulmonary arrest. He testified: "The child can lose consciousness and quit breathing and then very shortly thereafter, the heart stops." He stated that, in forty percent of these cases, you will see *Page 8 
injuries to the child's joints and, in twenty percent of these cases, you will see injuries to the child's neck.
 {¶ 20} Dr. Steiner also testified that with translational type forces such as a fall to the ground, you would expect to see a single impact injury where the patient's head hits the ground. He testified that since the scalp is the most vulnerable tissue, you would expect to see a significant bruise, goose egg, skin injury, scalp injury or skull fracture at the point of impact. He stated you might also see a subdural hemorrhage at the point of impact.
 {¶ 21} Dr. Steiner also testified that he did not observe any cuts or abrasions on Noah. He stated Noah's injuries "were consistent with a mechanism of rotational acceleration and deceleration trauma and those injuries were the thin film subdural hematoma along the surface of the brain and between the two halves of the brain as well as bilateral retinal hemorrhaging." He stated the injuries were not consistent with a fall down three steps because there was no soft injury to the scalp, no soft tissue swelling and no skull fracture present. He further testified Noah's intracranial hemorrhage was not consistent with an impact injury or a single blunt force trauma.
 {¶ 22} Dr. Steiner also testified that the injuries to Noah's face were not consistent with the use of a cervical collar and that the injuries depicted in the autopsy photographs were not consistent with emergency therapeutic efforts.
 {¶ 23} Dr. John Pope, a pediatric intensive care specialist at Akron Children's Hospital, testified that, when Noah was admitted to the pediatric intensive care unit, he was in cardiac arrest, was resuscitated and exhibited no neurological function on exam. He stated the hospital used a breathing machine and gave Noah fluids and medication *Page 9 
to support his blood pressure. He stated the most prominent sign of injury was severe bilateral retinal hemorrhaging. He stated the CAT scan also indicated bleeding in the child's head. He stated these injuries were consistent with a rotational acceleration deceleration injury. He stated Noah's condition did not improve and that Noah was essentially brain dead.
 {¶ 24} Dr. George Sterbenz, a forensic pathologist employed by the Summit County Medical Examiner's Office, testified that, on May 13, 2006, he performed an autopsy on Noah. He testified that, prior to the autopsy, on May 11, 2006, he was present for Noah's organ procurement and took several photographs during the procedure. He testified that, prior to the organ procurement, Noah had three faint bruises on his right shoulder. He stated that Noah also had bruising on his low mid-back and a clustering of bruises at the right lower back. He stated there were two areas of bruising on Noah's right arm. One was a finger point type pressure on the upper arm and one was a grasping type bruise on the wrist area. He testified these bruises had occurred recently. He stated Noah had a bruise to the left side of his face that continued from the jaw line up over his entire cheek in continuity up into his temporal hair line with a bit of bruising on his earlobe. He stated there was also a finger point pressure bruise on the right side of Noah's face over his jaw. He stated the distribution of the bruise on the left side of Noah's face would be consistent with a slap i.e. the impact of a curving hand, and appeared to be recent. He further stated these injuries were not caused by a cervical collar.
 {¶ 25} Dr. Sterbenz also testified there were bite marks and bruising on the right and left side of Noah's tongue which were consistent with injuries that can be incurred *Page 10 
from blows to the head and blows to the face. He stated the bite marks were more severe than those you might expect to find from intubation.
 {¶ 26} Dr. Sterbenz testified that Noah had multiple bruising on his head including one bruise on the left side of his head, one bruise on the right side of his head and multiple impact bruises on the top of his head. He stated Noah had a slight bruise on the back of his neck that was not caused by any significant force.
 {¶ 27} Dr. Sterbenz also testified that he found internal bleeding at the base of Noah's neck and contusions to his spinal cord during the internal exam of the back of Noah's neck and spinal cord. He stated the injuries were consistent with a whiplash and brain injury. He stated the injuries to the neck and spinal cord could not be attributed to the slight bruising on the base of Noah's neck. He stated Noah also had a subdural hemorrhage in a diffused pattern, (meaning there was a little bit everywhere), which he stated is consistent with violent acceleration and deceleration of a child's head.
 {¶ 28} Dr. Sterbenz also testified Noah had injuries to his neuronal projections, i.e., axons. He stated that when there is violent back and forth movements of the head the neuronal projections become injured. He testified that a single impact or single impacts to the head can cause this type of injury, however, he stated the pattern of injuries which he observed during the autopsy indicate Noah suffered a whiplash type injury to his head and neck with this axon change being part of the spectrum of injury. He stated some of the injuries could have been caused by therapeutic intervention, however, in his opinion, the sum total of the pattern of injuries were not the result of therapeutic intervention. *Page 11 
 {¶ 29} Dr. Sterbenz also testified that Noah had a pattern of injuries that were not consistent with a short distance fall or a fall down three stairs. He testified Noah died due to severe injuries to his head and neck, specifically, cranial cerebral and cervical blunt force trauma. Cranial cerebral referring to his head and cervical referring to his neck and blunt force trauma referring to blows. He stated that he listed the manner of death as being homicide, meaning Noah's injuries were inflicted by another individual.
 {¶ 30} Dr. Sterbenz also testified that, in his opinion, the pattern of injuries indicated Noah was gripped firmly and thrust into a firm surface causing multiple impacts to Noah's head, and Noah experienced a back and forth whiplash type injury to his head and neck. He stated that the injuries could not have been caused by merely shaking the child's head back and forth. He stated that the force necessary to cause the injuries was excessive, such that a reasonable person would know they are doing a bad thing to a child. He further stated that the force used would have to be done by a much larger and stronger individual such as an adult or large adolescent. Finally, in his opinion, Noah's fatal injuries were not the result of an accident.
 {¶ 31} Chris Allen Van Ee, an employee of Design Research Engineering, who specializes in biomechanics, testified on behalf of the appellant. He stated that his area of expertise included the study of "short duration impacts or accelerations on the body and the body's response." He testified that his specialty is examining the mechanism of injury and how injuries can be prevented. He testified that the appellant asked him to investigate the range of potential injuries that could occur when a child falls down a short flight of steps. He stated: "Based on my tests, based on what I've read, a fall like that could result in a serious head injury with engineering certainty." *Page 12 
 {¶ 32} On cross-examination, Mr. Van Ee admitted that none of the scenarios from his testing of a child's fall depicted nine impacts to the top of the child's head and five impacts to the bottom of the child's head. He further admitted, he did not perform a test that reproduced the exact injuries which Noah suffered. He also stated his testing did not include shaking a child, while causing the head to come in contact with an object. He finally testified that, although there are some instances of death as the result of a short fall, in the majority of studies, a fall from the distance in the testing did not and would not result in severe injury or death.
 {¶ 33} Dr. John Jerome Plunkett, appellant's expert witness, was qualified by the court as an expert in the field of child head injury in the State of Ohio. He testified he reviewed Noah's Union Hospital records, the Akron Children's Hospital Records, the New Philadelphia Police reports, the autopsy report, the paramedics report, the EMT reports, the autopsy photographs and microscopic slides. He stated that, in his opinion, a single head impact injury caused Noah's death. He further stated that, in his opinion, the death was accidental.
 {¶ 34} Dr. Plunkett also testified: "The injury is consistent with what Ms. Mills stated happened. In other words, Noah's on the top of the landing of the step and he misses a step and he falls. He strikes the back, the lower part of his head, just above the neck, on one of the, on the leading edge of the tread of the steps and he strikes the, on one of the steps, and he strikes the side of his head at the other point. He also strikes his back the right side of his back between about the. About the level of the fifth rib, a couple of inches over from the midline. That impact injury caused him to be initially unconscious. He woke up somewhat in a few minutes, I don't know if it was five minutes *Page 13 
or ten minutes and then lost consciousness again. When the paramedics or the EMT's got to Ms. Mills home, Noah was in a complete cardiopulmonary arrest which means he had no detectable pulse and he wasn't breathing."
 {¶ 35} Dr. Plunkett testified: "He was initially resuscitated by the first responder, was taken to Union Hospital where he was stabilized as well as they could do and then transferred him to Akron Children's. As a result of the cardiopulmonary arrest, in other words, some period of time in which his brain was without oxygen, he developed brain swelling, a specific condition called malignant, which means bad, cerebral edema. It's a common complication of cardiopulmonary arrest from any cause in an infant or young child. And it was the brain swelling, which is really secondary or a cascade event that was the immediate cause of his death. But the ultimate cause of his death was impact injury to the back of his head." T. 1179-1180, 1217.
 {¶ 36} Dr. Plunkett testified that, in his opinion, acceleration and deceleration had nothing to do with Noah's retinal hemorrhages. He stated that in order to accelerate the eye to a level that would cause retinal hemorrhage, acceleration would have to be, approximately forty thousand times the acceleration due to gravity. He stated it is not possible to achieve that acceleration, even experimentally, on an eyeball with a diameter of half an inch or five eighths of an inch.
 {¶ 37} Dr. Plunkett also testified the bruising to the left side of Noah's face was not consistent with either a slap or an impact with a soft object. He testified as a forensic pathologist he has seen this type of bruising before in children under the age of two. He stated in his opinion the bruise was caused by a cervical collar that was applied by the EMT responders. He testified: "if the collar doesn't fit under the chin * * * it's going to ride *Page 14 
up over the jawbone itself and if you, if you squeeze it in place, it's going to cause a bruise." T.1195.
 {¶ 38} Dr. Plunkett also testified the bruises on Noah's back were caused either by his diaper or the straps that were used on the backboard. Dr. Plunkett stated Noah's coagulation system had gone haywire as a result of lack of oxygen and Heparin that was administered during the organ procurement to prevent blood clotting which resulted in bruising. He stated that, for these reasons, one could not conclude that the bruising was fingertip bruising. In the alternative, he suggested that the fingertip bruising could have been caused by hospital personnel holding Noah or applying a blood pressure cuff.
 {¶ 39} Dr. Plunkett testified that the red marks on the top of Noah's head were not the result of numerous blunt force impacts because they did not resemble the color usually associated with bruising. He testified that, in his opinion, the two linear marks, i.e. slight bruising, (train track pattern), on the back of Noah's neck were caused by an impact with the front edge of the tread of the steps. He stated, that when Noah struck the step, it caused two red lines on either side of the area of impact rather than one straight line. He testified: "the impact from the object compresses the central part and then pushes the blood over to the side and so you actually get bleeding in an area that is not the direct point of impact * * * that's very typical for hitting either at the edge of something or something that is rounded." T. 1209-1210.
 {¶ 40} Dr. Plunkett also testified that, in his opinion, Noah's spinal cord injury was not caused by a whiplash type force. He stated that when the brain swells it pushes down through the frame and magnum which is the large hole at the base of the brain. *Page 15 
"When the brain pushes down, it compresses the anterior cervical artery. When the anterior cervical artery is compressed, there's no more blood flow to the cervical portion of the spinal cord. The cervical portion of the spinal cord dies, it becomes necrotic." T.1210. He stated that this was the cause of Noah's spinal cord injury. He further stated that a whiplash injury would also cause ligament destruction, bone destruction and blood vessel destruction, none of which was present in Noah's case.
 {¶ 41} Dr. Plunkett also testified that Noah's optical nerve damage was likely caused by intracranial pressure. He testified that studies show that an acceleration deceleration injury can not cause retinal hemorrhage.
 {¶ 42} On cross-examination, Dr. Plunkett stated that he was not aware of any study which reported a child dying from a fall down stairs which were three and a half feet in height. He further testified that he would not expect a cervical collar, which had been formed from a towel, to cause bruising to the side of a child's face. Hypothetically, Dr. Plunkett agreed that, if someone had nine distinct impacts on the top of their head, along with a cluster of approximately five other impacts to the back occipital portion of their head, the injuries would not be typical of a fall down three steps.
 {¶ 43} On rebuttal, the state re-called Dr. Sterbenz. Dr. Sterbenz testified that, if a bruise is very mild, it can look pink to red in color. He stated that, if a bruise is more deeply under the skin, it will look more purple. If the bruise has more leakage of blood, it will look more purple and even black and over time it will proceed to change color, changing shades of yellows and browns and greens. He stated that the depth of the injury implies the amount of force. He testified that the back of Noah's head showed one to four discreet blunt force impacts. He stated the exact number could not be *Page 16 
determined because there could be overlapping impacts where enough force was used to result in bleeding into the membrane overlying the child's skull. He testified there were nine distinct impacts to the top of Noah's head and further stated he could not eliminate the possibility that there may have been more than one impact at each individual impact site.
 {¶ 44} Dr. Sterbenz testified that the bruising on Noah's arm could not have been caused by a blood pressure cuff. He stated that Noah had retinal hemorrhages as a direct result of severe blows to the head with acceleration and deceleration type forces affecting his brain. He stated Noah's retinas and optic nerves showed a pattern of bleeding associated with resuscitation and increased cerebral pressure, but that, Noah also had a pattern of bleeding in his eyes associated with blunt force trauma to the head.
 {¶ 45} With regard to Noah's neck injury, Dr. Sterbenz testified, "two linear bruises lying parallel is an injury that occurs when a narrow surface strikes the skin * * * The edge of the steps are surfaces at approximately a right angle and they're not a perfect right angle, there is textured surfaces and there is curved surfaces on the stair tread itself. Those stair treads would not yield with an impact that type of injury whereas a narrow, straight surface can reliably produce that type of injury." He testified he examined the steps at the appellant's home. He stated the top step was carpeted and there was a rubberized ridge or texture stair tread and a metal stair edge protector on each of the lower three steps. He testified he also used clay to make pattern impressions of the edge of the steps. He stated he made the impression to examine what an impact with the step edge would look like and how it would deform a soft *Page 17 
surface. He testified he typically uses this procedure to study injury patterns. He testified that a light push of the clay on the step showed a train track impression which he stated would not result in injury. He testified Noah had a linear superficial bruising on the back of his neck similar to a train track bruise but reiterated his earlier opinion that Noah also had an unrelated bruising injury to the deeper structures of his neck consistent with a rotational acceleration deceleration injury.
 {¶ 46} On June 14, 2007, after the presentation of evidence, the State voluntarily dismissed one count of murder and one count of child endangering. After considering the evidence presented, on June 15, 2007, the jury found the appellant guilty on the remaining charges. On June 22, 2007, appellant was sentenced to serve an aggregate prison term of fifteen years to life.
 {¶ 47} It is from this conviction and sentence that the appellant now appeals, setting forth the following assignments of error:
 {¶ 48} "I. THE COURT ERRED WHEN IT PLACED UNWARRANTED RESTRICTIONS ON THE DEFENDANT'S EXPERT WITNESS AND ALLOWED THE STATE TO INTRODUCE EVIDENCE OF A SCIENTIFIC EXPERIMENT WITHOUT CONDUCTING THE REQUIRED PRETRIAL HEARING ON ADMISSIBILITY.
 {¶ 49} "II. THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT ADMITTED IRRELEVANT, GRUESOME, REPETETIVE AND SUBSTANTIALLY PREJUDICIAL PHOTOGRAPHS OF THE DECEASED CHILD IN VIOLATION OF MILLS' CONSTITUTIONAL RIGHTS. *Page 18 
 {¶ 50} "III. THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND DEFENDANT'S CONVICTION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.
 {¶ 51} "IV. THE COURT ERRED WHEN IT FAILED TO RECORD ALL THE PROCEEDINGS IN THE CASE.
 {¶ 52} "V. APPELLANT WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL DUE TO NUMEROUS ERRORS AND OMISSIONS WHICH PREJUDICED APPELLANT'S TRIAL.
 {¶ 53} "VI. THE PROSECUTION PREJUDICED THE OUTCOME OF THE CASE THROUGH IMPROPER CLOSING ARGUMENT.
 {¶ 54} "VII. THE TRIAL COURT ERRED IN IMPOSING MULTIPLE PUNISHMENTS FOR ALLIED OFFENSES OF SIMILAR IMPORT CONTRARY TO R.C. 2941.25 AND THE DOUBLE JEOPARDY CLAUSE OF THE OHIO AND UNITED STATES CONSTITUTIONS."
 I {¶ 55} In the first assignment of error, the appellant argues that the trial court erred as follows: the trial court prevented appellant's expert, Dr. Plunkett, from presenting evidence which supported his expert opinion; the trial court permitted the State's expert, Dr. Steiner, to give an opinion regarding why people abuse children; and, the trial court permitted Dr. Sterbenz to introduce scientific evidence without a Daubert hearing.
 {¶ 56} The admissibility of evidence lies within the sound discretion of the trial court. State v. Robb (2000), 88 Ohio St.3d 59, 68,2000-Ohio-275, 723 N.E.2d 1019; *Page 19 
see also State v. Smith, 97 Ohio St.3d 367, 2002-Ohio-6659,780 N.E.2d 221. Absent a showing that a trial court has abused its discretion an appellate court will not disturb the trial court's ruling as to the admissibility of evidence. Millstone Dev., Ltd. v. Berry, Franklin App. No. 01AP-907, 2002-Ohio-2241. An abuse of discretion implies that the court acted unreasonably, arbitrarily or unconscionably. Rigby v. LakeCty. (1991), 58 Ohio St.3d 269, 271, 569 N.E.2d 1056
 {¶ 57} Appellant first argues that the trial court abused its discretion by preventing Dr. Plunkett from introducing a videotape and photographs. We disagree.
 {¶ 58} Dr. Plunkett sought to introduce a videotape of a child falling from playground equipment. He sought to introduce the video to bolster his opinion that children can suffer fatal injuries from short falls. Dr. Plunkett sought to introduce photographs to show that children suffer injuries from cervical collars. Appellee objected arguing the video and photographs could not be properly authenticated.
 {¶ 59} A photograph or video is admissible if it is relevant and is properly authenticated. State v. Hill (1967), 12 Ohio St.2d 88, 90,232 N.E.2d 394; Cincinnati, Hamilton Dayton Ry. Co. v. DeOnzo (1912),87 Ohio St. 109, 100 N.E. 320; Ohio Power Co. v. Diller (1969),18 Ohio App.2d 167, 247 N.E.2d 774; DeTunno v. Shull (1956), 75 Ohio Law Abs. 7602,144 N.E. 2d 669. Pursuant to Evid. R. 901, authentication is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims." Any person with knowledge may authenticate a photograph or videotape by testifying that it fairly and accurately depicts the subject at the time the photographs or videotape were taken. See State v. Hannah (1978), 54 Ohio St.2d 84, 88,374 N.E.2d 1359. *Page 20 
 {¶ 60} In the case sub judice, Dr. Plunkett could not properly authenticate the photographs or videotape. He testified that he was not familiar with the subject matter depicted. He testified that he was only familiar with the material because it had been considered either as a reference for his journal article or in preparation for testimony regarding facial injuries in children caused by cervical collars. Dr. Plunket testified he was not present when the events in the video and/or photographs occurred and did not treat the children depicted, therefore, Dr. Plunkett was unable to authenticate the evidence. Furthermore, appellee did not identify any other witness who could properly authenticate the evidence. Finally, although Dr. Plunkett was unable to authenticate the videotape and photographs, he was permitted to explain how the videotape and photographs contributed to his conclusions regarding the manner in which Noah's injuries and death occurred.
 {¶ 61} Appellant also argues that the trial court erred in permitting Dr. Steiner to give an unqualified opinion as to why people abuse children. As a practitioner in a particular field there are things that an expert may know by reason of their expertise. See Wightman v.Consolidated Rail Corp. (1999), 86 Ohio St. 3d 431, 715 N.E. 2d 546. As a pediatrician, Dr. Steiner testified that he is familiar with the care and treatment of children who have been physically abused and the behaviors of children that have triggered abusive behaviors in caretakers. He testified that his knowledge comes from literature and studies. The trial court ruled that Dr. Steiner could give an opinion regarding child behaviors that trigger abuse with regard to what the studies had shown. Dr. Steiner testified that the behaviors of children which trigger abusive reactions include fussiness, misbehavior and some sort of stress that is placed on the abuser *Page 21 
because of that misbehavior. Dr. Steiner stated: "Because of the crying and fussiness, that creates stress in the care provider * * * [which] causes violence to be directed toward the child." T.690. We do not find that the trial court abused its discretion in permitting Dr. Steiner to testify about matters which are within his knowledge and expertise.
 {¶ 62} Finally, appellant argues that the trial court erred by failing to conduct, sua sponte, a hearing to determine the admissibility of Dr. Sterbenz's expert testimony. In support, appellant argues that a trial court is required to conduct a preliminary "gatekeeping" hearing to determine whether expert testimony is based on methodology and reasoning that is scientifically valid citing Daubert v. Merrell DowPharmaceuticals, Inc. (1993), 509 U.S. 579, 589-590, 113 S.Ct. 2786,125 L.Ed.2d 469. Specifically, appellant argues that the trial court erred in failing to hold a Daubert hearing to determine whether Dr. Sterbenz's methodology of using play dough to recreate impressions of the stair treads at the appellant's home, then comparing the clay impressions to Noah's neck injury and concluding that the injuries were not the result of a fall down appellant's set of stairs, was scientifically reliable. Appellant argues that the methodology of creating the clay impressions was not scientifically reliable since clay and human flesh react differently to pressure.
 {¶ 63} Initially, we note that the appellant filed a pretrial motion in limine to exclude the introduction of Dr. Sterbenz's testimony regarding the clay impression of the steps at the appellant's home and any testimony associated with the clay impressions. In support, appellant made the limited argument that, pursuant to Evid. R. 702, Dr. Sterbenz could not be qualified as an expert in accident reconstruction and *Page 22 
biomechanics and, therefore, Dr. Sterbenz could not testify as an expert using clay molds to recreate the stair steps and scene of the alleged accident.
 {¶ 64} In response to the motion in limine, appellee conceded that Dr. Sterbenz was not an accident reconstruction expert. The State argued that as a pathologist, Dr. Sterbenz is familiar with injury patterns and has used clay molds in the past for investigative purposes. The State also argued that the method of making clay impressions does not require any particular expertise. The State further argued that Dr. Sterbenz made the clay impressions to establish that the leading edges of the stair steps made a curved impression when the steps deformed the soft surface of the clay. Finally, the State argued that Dr. Sterbenz's opinion that the stair steps did not cause the injury to Noah's neck was reliably based on his personal observations of the stair steps, the basic impressions he made in the play dough and his experience as a pathologist.
 {¶ 65} Prior to trial, the court held a hearing on appellant's motion in limine. After the presentation of arguments, by judgment entry, the trial court overruled appellant's motion in limine and reserved the right to limit Dr. Sterbenz's testimony if he exceeded his scope of expertise.
 {¶ 66} At trial, appellant did not request a Daubert hearing and did not renew his objection as set forth in the motion in limine to the testimony of Dr. Sterbenz which was as follows:
 {¶ 67} "State: Doctor, I'd like to talk about the tram track type bruise, I think you had said, to the back of Noah Shoup's neck. Now that particular injury is one that particular injury is one in which there's been previous testimony in this case by *Page 23 
defendant's expert John Plunkett that it was caused as a result of hitting the edge of the step. Do you hold that same opinion doctor?
 {¶ 68} "Dr. Sterbenz: No.
 {¶ 69} "State: And can you tell us why you do not hold that same opinion?
 {¶ 70} "Dr. Sterbenz: That injury, two linear bruises lying parallel is an injury that occurs when a narrow surface strikes the skin. A linear narrow surface strikes the skin. The edge of the steps are surfaces at approximately a right angle and they're not a perfect right angle, there is textured surfaces and there is curved surfaces on the stair tread itself. Those stair treads would not yield with an impact that type of injury whereas a narrow straight surface can reliably produce that type of injury.
 {¶ 71} "State: Now doctor, can you tell the members of the jury what steps you have taken to form your opinion?
 {¶ 72} "Dr. Sterbenz: Well first of all, I know what type of surfaces result in a tram track injury, bruise patterned injury. I have examined the steps directly and I have examined them in a way to demonstrate the edge appearance of what those steps would result in.
 {¶ 73} "State: Now Doctor, some of those steps that you have taken to, in formulating this opinion, you have, I believe captured or documented photographically, correct?
 {¶ 74} "Dr. Sterbenz: Yes.
 {¶ 75} "State: And that would have been probably I believe April 13th of 2007?
 {¶ 76} "Dr. Sterbenz: Yes.
 {¶ 77} "State: And can you tell us why you went there and what you did? *Page 24 
 {¶ 78} "Dr. Sterbenz: I specifically went there to look at the steps and address this issue of the tram track injury to the back of Noah Shoup's head, excuse me, neck and the assertion that the stair tread resulted in that injury.
 {¶ 79} "State: And doctor, do you have photographs of that visit?
 {¶ 80} "Dr. Sterbenz: Yes. * * *
 {¶ 81} "[continuation of explanation of photographs in power point presentation]
 {¶ 82} "Dr. Sterbenz: * * * As stated these are photographs at the rear of the residence as stated. These are the stairs in question, the rise is about three feet, the distance outward from the last riser is also about three feet. This is showing the stair tread. In these photographs, we can see that the top step is carpeted, that there is a rubberized ridge or texture stair tread on each of these lower three steps and there is a metal stair edge protector, I guess it would be termed, and this is the concrete surface at the bottom of the steps. * * *
 {¶ 83} "State: Doctor why did you take these photographs?
 {¶ 84} "Dr. Sterbenz: To demonstrate what the stairs look like.
 {¶ 85} "State: * * * what else did you do?
 {¶ 86} "Dr. Sterbenz: Okay. I used basic common clay, just play dough one can pick up at Wal-Mart themselves to demonstrate the profile of the step. I photographically wanted to demonstrate what the profile looked like which is what I'm doing in this slide * * * but I additionally wanted to make some, you know, basic pattern impression to demonstrate what the edge, the leading edge, the proposed impact edge would appear like as it would deform soft surfaces. So, in the upper right hand corner which is State's exhibit O-10, I took, just some basic type play-dough type clay and carefully pressed it *Page 25 
over to the edge on the leading edge of the step in an attempt to duplicate a tram track pattern * * *. In these photographs, we can see an impression where I pushed very gently onto the edge with the clay and then on the right we see an impression where I pushed more firmly on the edge of the clay. * * * The leading edge is convex or curved outward and this obviously is going to be replicated with any kind of impact against the edge such that we have a, when pushed gently, we have a straighter edge corresponding to the top edge here and the edges start to curve outward corresponding to this curving edge. As I push more firmly, excuse me, I have that backwards. The straight edge here would correspond to the flat edge on the top and this is the beginning of the curving edge here corresponding to the convex surface of the leading edge. When pushing more firmly, you start to see some of the ribbed pattern in the clay as it's pushing into the clay. * * *
 {¶ 87} "Dr. Sterbenz: * * * on the cross section through the clay where the ribbed edge starts to appear in the, on the clay and the concave convex surface is more pronounced here.
 {¶ 88} "State: * * * have you ever used clay impressions before in injury pattern comparison?
 {¶ 89} "Dr. Sterbenz: Yes.
 {¶ 90} "State: And can you tell us, what do these clay pattern impressions indicate to you regarding the tram track injuries on Noah Shoup's neck?
 {¶ 91} "Dr. Sterbenz: Yes. These clay impressions are not meant to suggest the injury with an impact on the surface will look exactly like the deformed surface of the *Page 26 
clay. It's rather to show what the body surface deformation will look like during the course of impact so implying what the injury will appear as.
 {¶ 92} "Here with the very light pressure, it's a single pressure point centrally. However, light pressure against a surface is unlikely to result in a bruise. So this, though this pattern here pushing very lightly begins at approximately the tram track pattern on the back of Noah's neck. This type of pressure would actually result in an injury. This type of pressure is the type of pressure that would result in an injury and you see that the surface indeed is a complex type deformation and the corresponding injury would have a more complex appearance.
 {¶ 93} "State: Dr. Sterbenz, are your findings on Noah in any way consistent with the clay impressions you made?
 {¶ 94} "Dr. Sterbenz: No. This type of deformation is not going to result in a clean and simple linear track type pattern injury. * * *
 {¶ 95} "[testimony continues as to photographs exhibits O-21 through O-24]
 {¶ 96} "Dr. Sterbenz: These photos are to answer the obvious question then what type of surface would result in that tram track type bruise on the back of Noah's neck.
 {¶ 97} "It's going to be a surface something like a ruler shown in Exhibit O-21. I am not saying that it was a ruler, a surface like this ruler. And what's really important about this ruler is being demonstrated in O-22. It's a narrow surface being pressed into the clay and when you look at the impression that it leaves in the lower left, O-23, we see a long, we see a linear narrow straight impression in the clay. On cut surface we see that it's an indentation, a sharp indentation, this is O-24. *Page 27 
 {¶ 98} "What occurs to skin with an impact from a surface like this is that the skin beneath the point of impact is pushed down. The skin on either side is stretched and I have to qualify this, the impact has to be quick. It's a, it's a fast, firm blow to the skin so it's happening within a fraction of a second and the point of impact is pressed down. That point doesn't actually bruise. The surface, the skin surface on either edge is rapidly stretched, small blood vessels, the microscopic, the capillaries are torn and bleeding occurs on either side of the point of impact.
 {¶ 99} "In real life, in a person, the skin doesn't stay deformed like it does in clay so this will pop back to the surface and be left with a bruise on the (sic) either side of the point of impact. Since it is a narrow straight edge causing the injury, the either[1] edge where the impact occurs is slightly straight or braided. That's exactly the kind of injury that Noah had on the back of his head. It was linear superficial bruising with superficial scraping or abrasion.
 {¶ 100} "Also with a lightweight surface such as a ruler, one's not necessarily going to have bruising to the deeper structures or injury to the deeper structures because the impact is affecting the skin but there's not enough weight to affect the deeper structures and that's exactly what was seen in Noah's injury when I reflected the skin or cut into the skin at the back of his neck, the bruising was limited only to the skin surface, using the surface of the clay as an example, but as I went deeper, examined deeper into the skin, there was no bleeding or bruising or injury to the deeper structures. You remember that I did describe a whiplash type injury very deep in the neck, that's completely different separate injury from this track type of bruising patterned injury at the back of his neck. * * * *Page 28 
 {¶ 101} "State: Doctor, the opinions that you expressed up to this point, one being the cause of death is blunt force trauma to Noah Shoup's neck and head, you previously stated that opinion to a reasonable degree of medical certainty?
 {¶ 102} "Dr. Sterbenz: Yes.
 {¶ 103} "State: Do you still hold that opinion?
 {¶ 104} "Dr. Sterbenz: Yes.
 {¶ 105} "State: Lastly Doctor, you've been to the home of Marsha Mills, you have taken clay impressions, based on these observations, based on the totality of circumstances as you know them, are you still of the opinion that Noah Shoup's injuries could not have resulted from a fall down the steps at 328 Park Avenue, rear?
 {¶ 106} "Dr. Sterbenz: Yes.
 {¶ 107} "State: Do you hold these opinions to a reasonable degree of medical certainty?
 {¶ 108} "Dr. Sterbenz: Yes." T. 1326-1339.
 {¶ 109} Appellee argues that Dr. Sterbenz's testimony regarding the clay impression was similar to that of a lay witness pursuant to Evid. R. 701 and therefore a Daubert hearing was not required. We disagree. Rather we find that Dr. Sterbenz properly testified as an expert in pathology which includes expertise in injury patterns. We further find that Dr. Sterbenz's methodology of using clay molds as a basis for his expert opinion did not require a Daubert hearing.
 {¶ 110} Pursuant to Evid. R. 702, "[a] witness may testify as an expert if all of the following apply: *Page 29 
 {¶ 111} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 112} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 {¶ 113} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 {¶ 114} "(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 {¶ 115} "(2) The design of the procedure, test, or experiment reliably implements the theory;
 {¶ 116} "(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."
 {¶ 117} In State v. Nemeth (1998), 82 Ohio St.3d 202, 207,1998-Ohio-376, 694 N.E.2d 1332, the Supreme Court stated that "[c]ourts should favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid. R. 702 are met." See also, Terry v.Caputo, 115 Ohio St.3d 351, 356, 2007-Ohio-5023, 875 N.E.2d 72, 77.
 {¶ 118} Determining whether a witness may provide expert testimony "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert v. Merrell Dow Pharmaceuticals, Inc. *Page 30 
(1993), 509 U.S. 579, 592, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469. InDaubert "the United States Supreme Court discussed the question of when expert scientific testimony is relevant and reliable." Miller v. BikeAthletic Co. (1998), 80 Ohio St.3d 607, 611, 1998-Ohio-178,687 N.E.2d 735.
 {¶ 119} To determine reliability, the Daubert court stated that a court must assess whether the reasoning or methodology underlying the testimony is scientifically valid. Daubert 509 U.S. at 592-593,113 S.Ct. at 2796, 125 L.Ed.2d at 482. In evaluating the reliability of scientific evidence, several factors are to be considered: (1) whether the theory or technique has been tested; (2) whether it has been subjected to peer review; (3) whether there is a known or potential rate of error; and (4) whether the methodology has gained general acceptance.Daubert at 509 U.S. 593-594. This method was adopted for Ohio trial judges in Miller v. Bike Athletic Co., supra.
 {¶ 120} In Miller, the Supreme Court stated that "the reliability requirement of Daubert should not be used to exclude all evidence of questionable reliability, nor should a court exclude such evidence simply because the evidence is confusing. In re Paoli RR. Yard PCBLitigation (C.A.3, 1994), 35 F.3d 717, 744. Instead, there must be something that makes the scientific technique particularly overwhelming to laypersons for the court to exclude such evidence. Id. at 746. Thus, the `ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's technique or principle [is] sufficiently reliable so that it will aid the jury in reaching accurate results.' DeLuca v. Merrell DowPharmaceuticals, Inc. (C.A.3, 1990), 911 F.2d 941, 956, quoting 3 Weinstein's Evidence (1988) 702-35, Section 702[03]." *Page 31 
 {¶ 121} Furthermore, in Kumho Tire Co., Ltd. v. Carmichael (1999),526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238, the United State's Supreme Court recognized that "[t]he trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable." Kumho Tire at 152. In turn, "[the abuse of discretion] standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion." Id., citing General Elec. Co. v. Joiner (1997),522 U.S. 136, 138-139,118 S.Ct. 512, 139 L.Ed.2d 508. Therefore, a trial court is not required to hold a pre-trial Daubert hearing. See State v.Fulton, Clermont App. No. CA2002-10-085, 2003-Ohio-5432, paragraphs 13-19 (finding no error in trial court's decision to deny pretrialDaubert hearing on the admissibility of evidence); See also, State v.Goins, Mahoning App. No. 02CA68, 2005-Ohio-1439.
 {¶ 122} In this case, appellant essentially argues that placing clay over a stair tread and applying pressure is not a reliable method of creating an impression which can be used to analyze and reach a reliable conclusion that pertains to an injury to human flesh.
 {¶ 123} Dr. Sterbenz initially testified that based on his experience as a pathologist and his knowledge of injury patterns that the pattern of the injuries to Noah's neck was caused by a linear object. Dr. Sterbenz then conduct further investigation using the standard methods he has used in past investigations to determine whether the linear object that caused the injury could have been one of the stair steps at the appellant's home. *Page 32 
 {¶ 124} Dr. Sterbenz testified that he observed the steps at the appellant's home and observed the leading edge of the steps. There were also photographs taken of the steps and the edges of the steps. He then took clay and pushed the clay onto the leading edge of the stairs. Dr. Sterbenz concluded that an impact with the stair could not have caused the injury to the back of Noah's neck.
 {¶ 125} We find that Dr. Sterbenz's method of using clay to examine the shape of the edge of the stair steps was straightforward. The method did not require any special expertise or scientific expertise. Furthermore, the method would not have been particularly overwhelming to a lay person.
 {¶ 126} Accordingly, we do not find that the trial court erred in failing to sua sponte conduct a Daubert hearing.
 {¶ 127} For these reasons, we do no find the arguments in appellant's first assignment of error well taken. Accordingly, appellant's first assignment of error is hereby overruled.
 II {¶ 128} In the second assignment of error, appellant argues the trial court committed plain error when it permitted the introduction of prejudicial autopsy photographs, specifically, photographs of the child's body after aggressive medical care, photographs of the child's tongue, eyes and retracted scalp.
 {¶ 129} The admission of photographic evidence is left to the discretion of the trial court. State v. Maurer (1984),15 Ohio St.3d 239, 264, 473 N.E.2d 768, 791; State v. Morales (1987),32 Ohio St.3d 252, 257, 513 N.E.2d 267, 273. In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, *Page 33 
arbitrary or unconscionable and not merely an error of law or judgment.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 450 N.E. 2d 1140.
 {¶ 130} In this case, the appellant did not object to the introduction of the appellee's 53 autopsy photographs. In fact, appellant stipulated to the admission of an additional 19 autopsy photographs.
 {¶ 131} Pursuant to Evid. R. 103(A), a party's failure to object to the admission of evidence at trial constitutes a waiver of all but plain error on appeal. State v. Frazier (1995), 73 Ohio St.3d 323, 332,1995-Ohio-235, 652 N.E. 2d 1000; State v. Lott (1990),51 Ohio St.3d 160, 174, 555 N.E. 2d 293 citing State v. Gordon (1971),28 Ohio St.2d 45, 276 N.E. 2d 243, at paragraph two of the syllabus.
 {¶ 132} Crim. R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." However, for a reviewing court to find plain error, the court must find that the error is an obvious defect in trial proceedings which affected the defendant's substantial rights. State v. Barnes, 94 Ohio St.3d 21, 2002-Ohio-68,759 N.E. 2d 1240. Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Long (1978), 53 Ohio St.2d 91,372 N.E.2d 804, paragraph three of syllabus.
 {¶ 133} Relevant, non-repetitive photographs, even if gruesome, are admissible if the probative value of each photograph exceeds the prejudicial impact to the accused. State v. Maurer, supra at paragraph seven of the syllabus; State v. Morale, at 32 Ohio St.3d 252, 257,513 N.E.2d 267. Photographs which help the jury appreciate the nature *Page 34 
of the crime and illustrate the coroner's testimony have been repeatedly held to be admissible. State v. Worthington (1966), 6 Ohio St. 2d 14,25, 215 N.E. 2d 568.
 {¶ 134} In this case, the prosecution alleged the child died as the result of multiple blunt force impacts to his head in conjunction with rotational acceleration deceleration forces to his neck and head which caused him to suffer bilateral retinal hemorrhaging, a subdural hematoma, cerebral edema, a spinal injury and bruising to his tongue. Although the 53 autopsy photographs submitted by the State are explicit and depict the pathologist's manipulation of the child's body, head, eyes and tongue, each photograph was professionally explained in its entirety by Dr. Sterbenz as it related to the nature of the injuries, the cause of the injuries and his opinion as to the cause of the child's death.
 {¶ 135} Dr. Sterbenz testified that the photographs of Noah's tongue depicted bruising and superficial bite marks associated with blows to the head. The photos of Noah's eyes were used to show the severity of the retinal hemorrhaging and damage to the optic nerve. The photos of Noah's head and brain were used to show the diffusion of blood which Dr. Sterbenz claimed was consistent with an injury from rotational acceleration deceleration forces. The photos of Noah's spinal cord were used to show the location of the internal injury as well as to permit the jury to compare a damaged spinal cord to a healthy spinal cord.
 {¶ 136} Upon review, we find that 53 of the autopsy photographs were introduced to illustrate the coroner's testimony and provide his perspective on the pattern of injuries which Noah suffered. Furthermore, the appellant's expert, Dr. Plunkett, used many of the same 53 autopsy photographs to explain his interpretation of the injuries which *Page 35 
caused Noah's death and to bolster his own conclusions that the injuries resulted from an accidental fall.
 {¶ 137} The additional 19 photographs, taken during the autopsy appear to be repetitive of the first 53 photographs. Furthermore, appellant stipulated to the admission of the 19 photographs. An appellant can not assign as error the acceptance of a stipulation by the trial court after he has invited the claimed error. See State v. Large, Stark App. No. 2006 CA 00359, 2007-Ohio-4685; State v. Matthews, Allen App. No. 1-83-58, (Dec. 5, 1984), 1984 WL 8124. "A party will not be permitted to take advantage of an error which he himself invited or induced the court to make." Lester v. Leuck (1943), 142 Ohio St. 91, 50 N.E.2d 145, paragraph one of syllabus.
 {¶ 138} For these reasons, we do not find that the introduction of the autopsy photographs was an obvious defect in trial proceedings, nor do we find that the introduction of the photographs affected the defendant's substantial rights. In fact, we find that the introduction of the photographs was, in part, a tactical decision by the defense to support the appellant's theory as to the cause of Noah's death.[2]
 {¶ 139} Accordingly, appellant's second assignment of error is found not well-taken and is hereby, overruled.
 III {¶ 140} In the third assignment of error, the appellant argues the jury's verdict is against the manifest weight and sufficiency of the evidence. *Page 36 
 {¶ 141} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror "in reviewing the entire record, `weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury `clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" State v.Thompkins (1997), 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, quoting State v. Martin (1983) 20 Ohio App.3d 172, 175, 485 N.E.2d 717.
 {¶ 142} A sufficiency of the evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law. State v. Thompkins, (1997), 78 Ohio St.3d 380, 678 N.E. 2d 541. The proper test to apply to such an inquiry is the one set forth in paragraph two of the syllabus of State v. Jenks (1991),61 Ohio St.3d 259, 574 N.E. 2d 492, superceded by the State Constitutional Amendment on other grounds as stated in State v. Smith (1997), 80 Ohio St.3d 89,1997-Ohio-355, 684 N.E.2d 668. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."
 {¶ 143} The appellant argues, in part, that the circumstantial evidence does not prove beyond a reasonable doubt that appellant is guilty of the charged offenses. *Page 37 
Appellant also argues that the evidence presented by the appellant to rebut the appellee's experts' opinions creates reasonable doubt as to the appellant's guilt.
 {¶ 144} Initially, we note that if the State relies upon circumstantial evidence to prove an essential element of an offense, it is not necessary for "such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction."State v. Daniels (June 3, 1998), Summit App. No. 18761, 1998 WL 289417, quoting State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus. "Circumstantial evidence and direct evidence inherently possess the same probative value [.]" State v.Smith (Nov. 8, 2000), Lorain App. No. 99CA007399, 2000 WL 1675052, quoting Jenks, 61 Ohio St.3d at paragraph one of the syllabus.
 {¶ 145} In this case, appellant was convicted of one count of murder in violation of R.C. 2903.02(B), with felonious assault as a predicate offense, one count of murder in violation of R.C. 2903.02(B) with child endangering as a predicate offense, one count of felonious assault in violation of R.C. 2903.11(A)(1) and one count of endangering children in violation of R.C. 2919.22(B)(1).
 {¶ 146} R.C. 2903.02(B) sets forth the elements for murder with the predicate offense of felonious assault and states as follows:
 {¶ 147} "(B) No person shall cause the death of another as a proximate result of the offender's committing an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."
 {¶ 148} An offense of violence is defined in R.C. 2901.01(A)(9) to include, inter alia, a violation of R.C. 2903.11 (felonious assault) and a violation of R.C. 2919.22(B)(1-4) (child endangering). *Page 38 
 {¶ 149} R.C. 2903.11(A)(1) sets forth the pertinent elements of felonious assault and states as follows:
 {¶ 150} "(A) No person shall do either of the following:
 {¶ 151} "(1) Cause serious physical harm to another or another's unborn;"
 {¶ 152} Serious physical harm to persons is defined in R.C. 2901.01
and means any of the following:
 {¶ 153} "(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
 {¶ 154} "(b) Any physical harm that carries a substantial risk of death;
 {¶ 155} "(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
 {¶ 156} "(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
 {¶ 157} "(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain."
 {¶ 158} R.C. 2919.22(B)(1) sets forth the pertinent elements of child endangering and states as follows:
 {¶ 159} "(B) No person shall do any of the following to a child under eighteen years of age * * *:
 {¶ 160} "Abuse the child;"
 {¶ 161} Pursuant to 2919.22((E)(1)(d), if a violation of 2919.22(B)(1) results in serious physical harm to the child, the offense is a felony of the second degree. *Page 39 
 {¶ 162} It appears that, in determining the appellant's guilt or innocence, the jury was left to consider the appellant's versions of the event, medical testimony, autopsy findings and the conclusions of both the appellant's and appellee's experts. In considering the evidence, the jury was essentially asked to determine whether Noah's fatal injuries were the result of an accident or the abusive actions of the appellant. Prior to deliberations, the jury was instructed that it was free to believe or disbelieve any witness and was given guidance on the manner in which they could judge the credibility of both lay and expert witnesses.
 {¶ 163} Based upon the verdict, it appears that the jury gave more weight to the testimony of the medical professionals and experts who treated and examined Noah's pattern of injuries. The mere fact that the jury chose to believe the testimony of the prosecution's witnesses does not render a verdict against the manifest weight of the evidence.State v. Moore, Wayne App. No. 03CA0019, 2003-Ohio-6817 at paragraph 18. Upon a review of the record, we find that the evidence provided by the State's witnesses supported the jury's verdict.
 {¶ 164} In this case, the treating physicians who examined Noah testified that Noah's injuries could not have been caused by a short fall down a flight of steps and/or emergency therapeutic treatment.
 {¶ 165} Dr. Steiner testified that Noah's injuries were consistent with a rapid rotational acceleration and deceleration of a child's head and neck.
 {¶ 166} Dr. Sterbenz testified that the bite marks and bruising to Noah's tongue were consistent with a blow to a child's head and/or face. He stated that the bilateral retinal hemorrhages, severe optic bleeding and internal spinal cord injury were *Page 40 
consistent with a rapid acceleration and deceleration of the child's head which was caused by excessive force, most likely caused by an adult. Dr. Sterbenz also testified that the bruising to Noah's face, arms and torso were likely caused by human fingers and a slap to the left side of Noah's face. Finally, Dr. Sterbenz testified that the multiple impact injuries to the top and side of Noah's head were caused by a blunt force impact with another object. In conclusion, Dr. Sterbenz testified that, in his opinion, the pattern of injuries was consistent with physical abuse and ruled Noah's death a homicide.
 {¶ 167} Based upon the evidence presented, we do not find that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Further, we do find that, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Accordingly, appellant's third assignment of error is found not well-taken and is hereby, overruled.
 IV {¶ 168} In the fourth assignment of error, the appellant argues she is entitled to a new trial because the trial court failed to record all the proceedings. The appellant argues there are numerous incidents in the record where it is indicated that a side bar was held but that no recording of the conversation between the court and counsel is available for review.
 {¶ 169} In State v. Palmer (1977), 80 Ohio St. 3d 543, 687 N.E.2d 685, the Supreme Court addressed situations where the entire proceeding has not been duly recorded. In Palmer, the Court stated: "[i]n a number of cases involving death penalty appeals, this Court has clearly held that reversal of convictions and sentences on *Page 41 
grounds of some unrecorded bench and chambers conferences, off the record discussions, or other unrecorded proceedings will not occur in situations where the defendant has failed to demonstrate that (1) a request was made at the trial that the conferences be recorded or that objections were made to failures to record, (2) an effort was made on appeal to comply with App. R. 9 and to reconstruct what occurred or to establish its importance, and (3) material prejudice resulted in the failure to record the proceedings at issue." State v. Palmer,80 Ohio St.3d 543, 554, 687, N.E.2d 685, 696.
 {¶ 170} In this case, the record does not reflect that appellant requested that all the side bar conferences be recorded. The appellant has also failed to affirmatively demonstrate any material prejudice which resulted from the unrecorded sidebars. Finally, appellant has failed to establish that any effort was made to re-create the side bars. Accordingly, appellant's fourth assignment of error is not well-taken and is hereby overruled.
 V {¶ 171} In the fifth assignment of error, the appellant argues counsel was ineffective. In support, appellant lists seven reasons why counsel was ineffective which are as follows:
 {¶ 172} "1. Counsel failed to object to the gruesome, irrelevant, prejudicial photos, and counsel stipulated to 19 photographs about which there was no testimony, but [the exhibits] were marked exhibits and given to the jury.
 {¶ 173} "2. Counsel failed to object to prosecutor's closing arguments.
 {¶ 174} "3. Counsel failed to object to hearsay when the State's witnesses testified as to what they believed Mills told them regarding Shoup's accident. *Page 42 
 {¶ 175} "4. Counsel ineffectively cross-examined the State's expert witnesses by not confronting them with the defense expert's conclusions.
 {¶ 176} "5. Counsel failed to force the State to elect a single theory of prosecution"
 {¶ 177} "6. Counsel failed to request Crim. R. 16(b)(1)(g) material.
 {¶ 178} "7. Counsel permitted the State's experts who [are] non-pathologist[s] to testify to cause of death without objection."
 {¶ 179} In this assignment of error, the appellant fails to refer this Court to any specific parts of the record and fails to assert anything other than the seven statements of error and the following: "To prevail on a claim of ineffective assistance of counsel, a defendant must meet the two-prong test set forth in Strickland v. Washington (1984),466 U.S. 668, 687. But for counsel's errors, the results of the trial would have been different." Citing appellant's brief at pages 26 and 27.
 {¶ 180} Initially, we note that, pursuant to App. R. 16(A)(7), it is appellant's responsibility to set forth an argument which contains the appellant's contention and reason(s) in support of the contention, with citations to authorities, statutes and parts of the record upon which the appellant relies. Appellant has failed to set forth this assignment of error in accordance with App. R. 16(A)(7). Pursuant to App. R. 12(A)(2), this Court may disregard appellant's arguments. However, although appellant has failed to follow the appellate rules, we shall consider, as best we can decipher, appellant's arguments.
 {¶ 181} Pursuant to Strickland v. Washington, to establish ineffective assistance of counsel, appellant must show (1) a deficient performance by counsel, i.e., a performance falling below an objective standard of reasonable representation, and (2) *Page 43 
prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different.Strickland v. Washington (1984), 466 U.S. 668, 687-688, 694,104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley (1989), 42 Ohio St.3d 136,538 N.E.2d 373, paragraph two of the syllabus. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."Strickland, 466 U.S. at 691. Furthermore, the Court need not address both Strickland prongs if an appellant fails to prove either one.State v. Ray, Summit App. No. 22459, 2005-Ohio-4941, at paragraph 10.
 {¶ 182} Appellant argues counsel was ineffective for failing to object to the State's 53 autopsy photographs and for stipulating to the admissibility of 19 autopsy photographs. Appellant further argues counsel was ineffective for failing to object to the prosecutor's closing argument, hearsay statements (i.e. out of court statements by appellant) and the medical doctors' opinions regarding the cause of Noah's death.[3]
 {¶ 183} We have found that the introduction of the 53 autopsy photographs and the prosecutor's closing comments did not amount to plain error. (See assignments of error II and VI). Furthermore, assuming arguendo, counsel's stipulation to the additional 19 autopsy photographs fell below a reasonable standard of representation, we do not find that but for the introduction of the 19 autopsy photographs, the results of the trial would have been different. We are concerned with counsel's failure to object to, at least, some of the photographs and with counsel's stipulation regarding the 19 *Page 44 
photos because the photos are gruesome and some seem to be repetitious. But we can not say that, in the context of all the evidence in the case and, given that some of the gruesome photos were reasonably admitted so the jurors could judge for themselves whether the injuries were violent and purposeful or accidental, the results of the trial would have been different if some of the photos had not been admitted.
 {¶ 184} With regard to the admission of appellant's statements, out-of-court statements by the accused are ordinarily admissible as an admission of a party-opponent under Evid. R. 801(D)(2). In fact, Evid. R. 801(D)(2) states that a party's own statement offered against that party is not hearsay. Additionally, the Sixth Amendment right to confrontation is not implicated by the defendant's own incriminating statement. See State v. Bell, 145 Ohio Misc.2d 55, 2008-Ohio-592,882 N.E.2d 502. Furthermore, this strategy permitted appellant's explanation for Noah's injuries to be presented to the jury without appellant taking the stand and testifying on her own behalf. Therefore, we do not find that counsel was ineffective in failing to object to these statements.
 {¶ 185} With regard to the doctors, whose specialties are not pathology, testifying as to the cause of Noah's death, appellant fails to specify which doctors and what statements were objectionable. The record reflects that the following doctors, who were not pathologists, testified at trial: Dr. John Current, Dr. Emily Scott, Dr. White, Dr. John Pope and Dr. Steiner. Each doctor was qualified as an expert medical witness. Dr. Current was qualified in the field of emergency care. Dr. Scott was qualified in the field of pediatric emergency care. Dr. White was qualified in the field of radiology. Dr. Pope was qualified as an expert in pediatrics and pediatric intensive care. Dr. Steiner was qualified in the fields of pediatrics and pediatric emergency care. *Page 45 
 {¶ 186} Each expert, (whose expertise was not in pathology), was asked whether the injuries they observed during Noah's treatment were either consistent with a fall down a set of stairs and/or, in Dr. Steiner's case, whether injuries were consistent with physical abuse. Each doctor testified that they were familiar with the type of injures which would typically result from a 2 year old falling down a set of steps. Based on their training, education and experience each doctor stated that Noah's injuries were not consistent with a fall down a 3 foot set of stairs. Dr. Steiner further testified that the injuries were consistent with physical abuse. We do not believe that counsel erred in failing to object to these conclusions, because experts may testify as to whether or not the findings from the expert's physical examination are consistent with abuse and/or whether the injuries are consistent with the patient's medical history. In re Lloyed, Franklin App. Nos. 95APF11-1435, 95APF11-1436, 95APF11-1437, (April 16, 1996), unreported,1996 WL 188707, citing State v. Barton (1991), 71 Ohio App.3d 455, 469,594 N.E.2d 702; State v. Proffitt (1991), 72 Ohio App.3d 807,596 N.E.2d 527; See also, State v. Gersin (1996), 76 Ohio St.3d 491, 1996-Ohio-114,668 N.E.2d 486; State v. Swain, Ross App. No. 01CA25911, 2002-Ohio-414. (Holding that trial court did not err in permitting pediatric physicians to testify against the defendant as experts about the cause of certain injuries for which he had been accused of child endangering and felonious assault, each doctor specialized in pediatric care, each was properly qualified to testify as an expert, and each was knowledgeable of such injuries a child could receive on their own and those which could occur from abuse.) For these reasons, we find these arguments not well taken. *Page 46 
 {¶ 187} Appellant argues that counsel was ineffective for failing to properly cross-examine the State's expert witnesses with the defense's expert's conclusions. "The extent and scope of cross-examination clearly fall within the ambit of trial strategy and debatable trial tactics does not establish ineffective assistance of counsel." State v. Leonard,104 Ohio St.3d 54, 82, 2004-Ohio-6235, 818 N.E. 2d 229. Counsel could have had a reason for this particular trial strategy. For example, counsel may have chosen not to cross-examine the State's witness with the defense's expert's opinion so that the State's expert would not have an opportunity to directly refute the defense expert's conclusions. In addition, the State's witnesses did address whether a fall and/or emergency lifesaving treatments could have cause Noah's injuries. Therefore, appellant has failed to establish that but for counsel's decision not to confront these witnesses with another expert's conclusion there was a reasonable probability the results of the trial would have been different. Appellant's argument is not well taken.
 {¶ 188} Appellant argues that counsel was ineffective for failing to force the State to elect a single theory of the case. Aside from this simple statement, appellant does not support this assertion. Further, the statement is not supported by the record. Throughout the trial, the State maintained that Noah's injuries were caused by appellant's abusive conduct and the State's experts testified in support of this theory. Accordingly, we do not find this assignment well taken.
 {¶ 189} Appellant argues that counsel was ineffective for failure to request "Crim. R. 16 (B)(1)(g) material".Crim. R.16(B)(1)(g) concerns in camera inspections of witness statements. Again the appellant fails to support this conclusion with references to the record. The record does not reflect that such statements were available. As such, *Page 47 
appellant has failed to establish that such statements existed or that the appellant suffered any prejudice.
 {¶ 190} Upon review, we find that appellant has failed to establish that counsel's conduct fell below an objective standard of reasonableness and/or that the alleged errors prejudiced the appellant or affected the outcome of the trial. Accordingly, appellant's fifth assignment of error is found not well-taken and is hereby overruled.
 VI {¶ 191} In the sixth assignment of error, the appellant argues that the prosecutor made improper comments during closing arguments which prejudiced the outcome of the case.
 {¶ 192} The test for prosecutorial misconduct is whether the prosecutor's comments and remarks were improper and, if so, whether those comments and remarks prejudicially affected the substantial rights of the accused. State v. Lot (1990), 51 Ohio St. 3d 160, 165,555 N.E.2d 293. When evaluating the prosecutor's arguments for possible misconduct, the court must review the argument as a whole and in relation to that of opposing counsel. State v. Moritz (1980), 63 Ohio St.2d 150, 157-158,407 N.E.2d 1268. Furthermore, isolated comments by a prosecutor are not to be taken out of context and given their most dangerous meaning.State v. Hill (1996), 75 Ohio St. 3d 195, 661 N.E. 2d 1068.
 {¶ 193} We note that the appellant did not raise any objection to the prosecutor's closing comments at trial. When a defendant fails to object to the state's remarks made during closing arguments, a plain error analysis under Crim. R. 52(B) is required. State v. Poling, Cuyahoga App. No. 2004-P-0044, 2006-Ohio-1008, at paragraph 33. "`Plain *Page 48 
error does not exist unless, but for the error, the outcome at trial would have been different.'" Id., quoting State v. Jenks (1991),61 Ohio St.3d 259, 282, 574 N.E. 2d 492.
 {¶ 194} We also note that, prior to the presentation of closing arguments, the trial court reminded the jury that counsel's arguments were not evidence. The court instructed the jury as follows: "I would just remind you that the statements of the attorneys are not evidence, they're designed to assist you in evaluating evidence." T.1345. Following the closing arguments, the trial court further instructed that evidence does not include the closing arguments of counsel. T.1397.
 {¶ 195} Appellant first argues that the prosecutor improperly undermined appellant's expert's testimony by stating that appellant's expert simply travels around, gives expert opinions and gets paid for it. In the closing argument, the prosecutor told the jury that the State's expert, Dr. Current, is an emergency room doctor who has treated many children who have been hurt falling down steps. The prosecutor then compared Dr. Current to the defense expert, Dr. Plunkett, and stated Dr. Plunkett makes his living testifying as an expert, which included travel and reimbursement, as opposed to Dr. Current who treats patients first hand. In State v. Tapke, Hamilton App. No. C-060494, 2007-Ohio-5124, the court held that the prosecutor's comments regarding the expert's compensation and that he testified nationally, based on the facts in evidence, were not improper. Id. at paragraph 83. We do not find these comments made by the prosecutor during closing argument to be plain error.
 {¶ 196} Appellant next argues the prosecutor improperly stated: "you will come to the same conclusion that I have in this case", "this woman is guilty" However, the prosecutor's actual statement was as follows: "What I'm asking you to do is apply the *Page 49 
facts, apply that to the law that's given and I'm certain that you will come to the same conclusion that I have in this case. I'm certain that you will come to the conclusion that the State of Ohio has proven to you beyond any reasonable doubt that Marsha Mills murdered Noah Shoup and she murdered him carrying out the crimes of felonious assault and child endangering and that he died as a proximate result of those injuries." We note that within the context of the argument, the prosecutor encouraged the jury to rely on the facts in evidence to reach their conclusion. "A prosecutor may comment upon the testimony and suggest the conclusion to be drawn by it, but a prosecutor cannot express his personal belief or opinion as to the credibility of a witness or as to the guilt of an accused, or go beyond the evidence which is before the jury when arguing for conviction." State v. Smith, Butler App. No. CA2007-05-133, 2008-Ohio-2499, at paragraph 7. We find that the prosecutor did improperly express his personal belief as to the guilt of the accused, but, based upon the context of the argument as a whole, we do not find the prosecutor's comments to be prejudicial.
 {¶ 197} Appellant also argues that the prosecutor improperly stated during rebuttal: "if any of your children were hurt, that's where they would go [Akron Children's Hospital]. It's the best place with the best people. And Dr. Steiner is one of those best people." During the rebuttal, the prosecutor compared the experience of the pediatricians at Akron Children's Hospital, including Dr. Steiner, to the experience of appellant's expert, Dr. Plunkett. Essentially, the State argued that Dr. Plunket has seen and treated one child in thirty-five years compared to the medical professionals at Akron Children's Hospital who serve seventeen counties in Ohio and specialize in *Page 50 
pediatric care. The inference that Akron Children's Hospital professionals may have more experience is supported by the evidence and is not improper or prejudicial.
 {¶ 198} The appellant also argues that the prosecutor made the following improper statement during rebuttal: "You've not heard one fact in this case from anybody to include in her seven versions that say this child went to the edge of the steps and fell off backwards." Appellant argues that the comment is an improper remark on appellant's right to remain silent. However, prior to making this comment, the prosecutor said, "The facts will lead you to the truth of what happened in this case and that's all I'm asking you to do is follow what the facts have shown you." T. at 1388. Then, the prosecutor proceeded to talk about the evidence in the case and said, "Those are the facts." T. at 1389. The "anybody" referred to by the prosecutor is not the appellant but rather any of the witnesses who testified. Essentially, what the prosecutor argued was that none of the witnesses could or did say that the child fell backwards down the steps. The State goes on to say that these were defense theories that were not supported by the evidence. "It is long standing precedent that the State may comment upon a defendant's failure to offer evidence in support of its case." State v. Collins,89 Ohio St.3d 524, 527, 2000-Ohio-231, 733 N.E.2d 1118. "Such comments do not imply that the burden of proof has shifted to the defense, nor do they necessarily constitute a penalty on the defendant's exercise of his Fifth Amendment right to remain silent." Id. "[T]he prosecutor is not precluded from challenging the weight of the evidence offered in support of an exculpatory theory presented by the defense.' Id. Accordingly, we find this argument to be without merit. *Page 51 
 {¶ 199} Appellant also argues that the following comment by the prosecutor misrepresented the evidence regarding the child's physical condition prior to the day of the incident: "He didn't have any bruises on him". Upon a review of the record, we find that the testimony presented by the child's mother and witnesses who treated the child prior to the autopsy stated that they did not observe any bruising on Noah. Therefore, this statement is in accordance with the evidence presented.
 {¶ 200} Appellant finally argues that the prosecutor improperly elicited sympathy from the jury with the following comment: "Listen to this child and make the proper decision." Prior to making this statement, the State argued that Noah Shoup was not available to testify but that he was talking to the jury through the autopsy. The prosecutor argued, "[h]e's telling you what happened to him". We do not find that the prosecutor's argument that the child is speaking through his injuries is improper or prejudicial.
 {¶ 201} Based upon our review of the record, and taking the arguments of counsel as a whole, we do not find plain error. Accordingly, appellant's sixth assignment of error is not well-taken and is hereby overruled.
 VII {¶ 202} In the seventh assignment of error, appellant challenges the court's imposition of multiple punishments for allied offenses of similar import. Appellant was convicted of two separate counts of Murder, in violation of R.C. 2903.02(B), for causing the death of Noah Shoup while committing a felony, and of Felonious Assault and Felony Child Endangering. The court imposed a separate concurrent sentence for each conviction. *Page 52 
 {¶ 203} Appellant argues that murder with an underlying felony offense of felonious assault and felonious assault are allied offenses of similar import. Appellant makes the same argument for the charge of murder with an underlying felony offense of child endangering and the charge of child endangering. Also, appellant argues that felonious assault and child endangering are allied offenses. Finally, appellant argues that two sentences for one death is impermissible.
 {¶ 204} R.C. 2941.25 defines allied offenses of similar import:
 {¶ 205} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 {¶ 206} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."
 {¶ 207} In State v. Rance, 85 Ohio St. 3d 632, 710 N.E. 2d 699,1999-Ohio-291, the Ohio Supreme Court held that offenses were of similar import if the offenses "correspond to such a degree that the commission of one crime will result in the commission of the other." Id. TheRance court further held that courts should compare the statutory elements in the abstract, which would produce clear legal lines capable of application in particular cases. Id. at 636. If the elements of the crime so correspond that the offenses are of similar import, the defendant may be convicted of both only if the offenses were committed separately or with a separate animus. Id. at 638-39. *Page 53 
 {¶ 208} However, last year the court clarified Ranee, because the test as set forth in Ranee had produced inconsistent, unreasonable and, at times, absurd results. State v. Cabrales, 118 Ohio St. 3d 54, 59,886 N.E. 2d 181, 2008-Ohio-1625. In Cabrales, the court held that, in determining whether offenses are of similar import pursuant to 2941.25(A), courts are required to compare the elements of the offenses in the abstract without considering the evidence in the case, but are not required to find an exact alignment of the elements. Id. at syllabus 1. "Instead, if, in comparing the elements of the offenses in the abstract, the offenses are so similar that the commission of one offense will necessarily result in the commission of the other, then the offenses are allied offenses of similar import." Id. The court then proceeds to the second part of the two-tiered test and determines whether the two crimes were committed separately or with a separate animus. Id. at 57, citing State v. Blankenship (1988),38 Ohio St. 3d 116, 117.
 {¶ 209} The Cabrales court noted that Ohio courts had misinterpretedRanee as requiring a "strict textual comparison," finding offenses to be of similar import only when all the elements of the compared offenses coincide exactly. Id. at 59. The Eighth Appellate District has described the Cabrales clarification as a "holistic" or "pragmatic" approach, given the Supreme Court's concern that Ranee had abandoned common sense and logic in favor of strict textual comparison. State v. Williams, Cuyahoga No. 89726, 2008-Ohio-5286, ¶ 31, citing State v. Sutton, Cuyahoga App. No. 90172, 2008-Ohio-3677. This court has referred to theCabrales test as a "common sense approach." State v. Varney, Perry App. No. 08-CA-3, 2009-Ohio-207, ¶ 23. *Page 54 
 {¶ 210} The Ohio Supreme Court revisited the issue of allied offenses of similar import in State v. Brown, 119 Ohio St. 3d 447,895 N.E. 2d 149, 2008-Ohio-4569. The court first found that aggravated assault in violation of R.C. 2903.12(A)(1) and (A)(2) are not allied offenses of similar import when comparing the elements under Cabrales, but did not end the analysis there. The court went on to note that the tests for allied offenses of similar import are rules of statutory construction designed to determine legislative intent. Id. at 454. The court concluded that while the two-tiered test for determining whether offenses constitute allied offenses of similar import is helpful in construing legislative intent, it is not necessary to resort to that test when the intent of the legislature is clear from the language of the statute. Id. In the past, the court had looked to the societal interests protected by the relevant statutes in determining whether two offenses constitute allied offenses. Id., citing State v. Mitchell
(1983), 6 Ohio St. 3d 416. The court concluded in Brown that the subdivisions of the aggravated assault statute set forth two different forms of the same offense, in each of which the legislature manifested its intent to serve the same interest of preventing physical harm to persons, and were therefore allied offenses. Id. at 455.
 {¶ 211} Most recently, the Ohio Supreme Court addressed this issue inState v. Winn, 2009-Ohio-1059. In Winn, the court considered whether kidnapping and aggravated robbery are allied offenses of similar import. The court compared the elements of each in the abstract. The elements for kidnapping, R.C. 2905.01(A)(2), are the restraint, by force, threat, or deception, of the liberty of another to facilitate the commission of any felony, and the elements for aggravated robbery, R.C. 2911.01(A)(1), are having a deadly weapon on or about the offender's person or under *Page 55 
the offender's control and either displaying it, brandishing it, indicating that the offender has it, or using it in attempting to commit or in committing a theft offense. The court found that in comparing the elements, it is difficult to see how the presence of a weapon, which has been shown or used, or whose possession has been made known to the victim during the commission of a theft offense, does not at the same time forcibly restrain the liberty of another. Id. at ¶ 21. Accordingly, the court found that the two offenses are so similar that the commission of one necessarily results in the commission of the other, citingCabrales, supra. Id. The court held, "We would be hard pressed to find any offenses allied if we had to find that there is no conceivable situation in which one crime can be committed without the other." Id. at ¶ 24.
 {¶ 212} Having found the offenses to be of similar import under theCabrales test, the Ohio Supreme Court in Winn did not consider the societal interests underlying the statutes to determine legislative intent, and determined legislative intent solely by applying R.C. 2941.25. The Winn court stated that, in Ohio, we discern legislative intent on this issue by applying R.C. 2941.25, as the statute is a "clear indication of the General Assembly's intent to permit cumulative sentencing for the commission of certain offenses." Id. at ¶ 6. This court noted in Varney, supra, that the Ohio Supreme Court inBrown expanded the first step of the allied offense analysis by adding the additional factor of societal interests protected by the statutes.Varney, at ¶ 16, citing State v. Boldin, Geauga App. No. 2007-G-2808,2008-Ohio-6408. In light of the Supreme Court's analysis inWinn, we now conclude that societal interest may be a tool to be used in some circumstances in determining if the intent of the legislature is clear from the criminal statutes being compared. *Page 56 
 {¶ 213} We first address the question of whether the convictions of child endangering and felonious assault are allied offenses of similar import with each offense's respective felony murder conviction.
 {¶ 214} R.C. 2903.02(B) sets forth the elements for murder with the predicate offense of felonious assault and/or child endangering as charged in the instant case:
 {¶ 215} "(B) No person shall cause the death of another as a proximate result of the offender's committing an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."
 {¶ 216} An offense of violence is defined in R.C. 2901.01(A)(9) to include, inter alia, a violation of R.C. 2903.11 (felonious assault) and a violation of R.C. 2919.22(B)(1-4) (child endangering).
 {¶ 217} R.C. 2903.11(A)(1) sets forth the pertinent elements of felonious assault:
 {¶ 218} "(A) No person shall knowingly do either of the following:
 {¶ 219} "(1) Cause serious physical harm to another or another's unborn;"
 {¶ 220} Serious physical harm to persons is defined in R.C. 2901.01(A)(5)(b) to include any physical harm that carries a substantial risk of death.
 {¶ 221} R.C. 2919.22(B)(1) sets forth the pertinent elements of child endangering:
 {¶ 222} "(B) No person shall do any of the following to a child under eighteen years of age * * *:
 {¶ 223} "Abuse the child;"
 {¶ 224} Pursuant to 2919.22((E)(1)(d), if a violation of 2919.22(B)(1) results in serious physical harm to the child, the offense is a felony of the second degree. *Page 57 
 {¶ 225} The state relies on State v. Hoover, Franklin App. No. 03AP-1186, 2004-Ohio-5541, for the proposition that the offenses of child endangering and felony murder based on child endangering are not allied offenses of similar import. The 10th District has also found felonious assault and felony murder based on felonious assault to not be allied offenses of similar import. State v.Henry, Franklin App. No. 04AP-1061, 2005-Ohio-3931. However, both of these opinions review the issue using strict textual comparison pursuant to Rance, supra. Accordingly, we find these cases inapplicable to the instant case based on current developments in the law.
 {¶ 226} While not exactly aligned in the abstract, the elements of appellant's felony murder conviction are sufficiently similar to the elements of felonious assault that the commission of murder logically and necessarily results in the commission of felonious assault. InCabrales, while reviewing the "confusion and unreasonable results" produced by applying the Rance test, the Supreme Court noted that the Fourth District found involuntary manslaughter and aggravated arson were not allied offenses because the statutes were dissimilar in at least two respects, but went on to note that as a practical result of this conclusion the defendant stood convicted of both creating a substantial risk of physical harm and causing the death of the victim based on one occurrence, which seemed "intuitively wrong." Cabrales at ¶ 19, citingState v. Cox, Adams App. No. 02CA751, 2003-Ohio-1935.
 {¶ 227} In the instant case, appellant stands convicted of causing serious physical harm to the child, which in this case was the death of the child, and causing his death based on the same incident of causing serious physical harm to the child. It is difficult to see how a person could cause a death without also causing serious physical harm, *Page 58 
particularly as serious physical harm is defined to include harm which carries a substantial risk of death.
 {¶ 228} Turning to the second step in the two-tiered test for determining whether the offenses are allied, there is no evidence in the record which demonstrates that the crimes of murder and felonious assault were committed as separate acts or with a separate animus. The evidence in the case points to a single incident leading to the death of Noah. We, therefore, find that the trial court erred in failing to merge the conviction of felonious assault with the conviction for felony murder with felonious assault as the predicate offense for purposes of sentencing.[4]
 {¶ 229} Similarly, the elements of child endangering are sufficiently similar to the elements of felony murder with child endangering as the predicate offense that the commission of the murder logically and necessarily also results in commission of child endangering. We fail to see how a person could cause the death of a child without at the same time abusing the child in such a manner that the abuse resulted in serious physical harm. In addition, as noted above in our discussion of felonious assault, no evidence in the record demonstrates that the two crimes were committed as separate acts or with a separate animus. The court therefore erred in failing to merge the conviction of child endangering with the conviction for felony murder with child endangering as the predicate offense for purposes of sentencing.
 {¶ 230} The only remaining issue is whether the two convictions for felony murder are allied offenses and must be merged. Although the predicate offenses are different, we have only one incident leading to the death of one victim. In reviewing the *Page 59 
unreasonable results reached by the appellate courts in applying theRanee test, the Cabrales court noted that the Second District had found that under Ranee, involuntary manslaughter and aggravated vehicular homicide are not allied offenses even where there is only one victim.Cabrales at 57-58, citing State v. Hendrickson, Montgomery App. No. 19045, 2003-Ohio-611. The Cabrales court further cited to Judge Christley's concurring opinion in State v. Waldron (Sept. 1, 2000), Ashtabula App. No. 99-A-0031, 2000 WL 1257520, which observed that by holding that involuntary manslaughter and aggravated vehicular homicide are not allied offenses of similar import, the court had not only found appellant guilty of killing two people, the court found him guilty of killing each victim two times. Cabrales at 58.
 {¶ 231} In the instant case, we fail to see how a person could commit felony murder based on a predicate offense of felonious assault without also committing felony murder based on child endangering, where as in this case the victim is a child. If the two convictions for felony murder are not merged, appellant will be convicted and sentenced for killing the same victim two times based on a single incident. This is exactly the type of result the Cabrales court sought to avoid in the future by clarifying Ranee. Further, once again, there is no evidence of a separate act or animus, as there is one victim and one incident leading to the death of the one victim. Accordingly, we find the trial court erred in failing to merge the felony murder convictions into one for purposes of sentencing.
 {¶ 232} While appellant could be charged and found guilty of two counts of felony murder, one count of child endangering and one count of felonious assault, the convictions must be merged into a single count of felony murder for sentencing. The *Page 60 
seventh assignment of error is sustained. This case is remanded to the Tuscarawas County Common Pleas Court with instructions to merge appellant's conviction for child endangering into the conviction for felony murder based on the commission of child endangering, to merge the conviction for felonious assault into the conviction for felony murder based on the commission of felonious assault, to merge the two counts of felony murder into one and to enter a single conviction and impose a single sentence for these allied offenses. This decision in no way affects the guilty verdicts issued by the jury. It only affects the entry of conviction and sentence.
Edwards, J., Hoffman, P.J., and Wise, J., concur. *Page 61 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Tuscarawas County Court of Common Pleas is affirmed in part and reversed in part. This case is remanded to the Tuscarawas County Common Pleas Court with instructions to merge appellant's convictions for child endangering and felonious assault into the convictions of felony murder, to merge the two counts of felony murder into one and to enter a single conviction and impose a single sentence for these allied offenses.
Costs to be paid 80% by appellant and 20% by appellee.
[1] "[E]ither" is the word that appears in the transcript.
[2] In State v. Wolery (1976), 46 Ohio St. 2d 316, 348 N.E. 2d 351, the Supreme Court held that a deliberate tactical decision by counsel to permit the introduction of evidence, i.e. not object to the admission of evidence, does not rise to the level of plain error. See also, State v.Clayton (1980), 62 Ohio St.2d 45, 402 N.E. 2d 1189.
[3] Appellant actually states the "State's experts who were non-pathologist". Appellant does not specify which expert's testimony is of concern. We will assume based upon the record appellant argues that the medical doctors who treated Noah should not have been permitted to give an expert opinion regarding the cause of Noah's death.
[4] We note that the trial court did not have the benefit of the recent developments in this area of the law, as appellant was sentenced on June 22, 2007, and the Supreme Court's decision in Cabrales was announced April 9, 2008. *Page 1